UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KENNETH RAWSON,

                    Plaintiff,

        v.

RECOVERY INNOVATIONS, INC., et al.,

                    Defendants.

CASE NO. C17-5342 BHS

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, STRIKING THE PRETRIAL CONFERENCE AND THE TRIAL DATE, AND REQUESTING A JOINT STATUS REPORT

        This matter comes before the Court on Defendants Jennifer Clingenpeel

("Clingenpeel"), Sami French ("French"), Vasant Halarnakar ("Halarnakar"), and

Recovery Innovations, Inc.'s ("RI") (collectively "Defendants") motion for summary

judgment, Dkt. 63, and Plaintiff Kenneth Rawson's ("Rawson") motion for partial

summary judgment, Dkt. 58. The Court has considered the pleadings filed in support of

and in opposition to the motions and the remainder of the file and hereby rules as follows:

# I. PROCEDURAL HISTORY

On May 8, 2017, Rawson filed a complaint against Defendants asserting numerous claims stemming from his involuntary commitment and treatment by Defendants. Dkt. 1. On June 8, 2017, Rawson filed an amended complaint against Defendants asserting that Defendants acted under color of law for purposes of 42 U.S.C. § 1983 and nine substantive claims as follows: (1) violation of his Fourth Amendment rights, (2) violation of his substantive due process rights under the Fourteenth Amendment, (3) violation of his procedural due process rights under the Fourteenth Amendment, (4) violations of the ADA, 42 U.S.C. § 12132, (5) outrage, (6) false imprisonment, (7) medical malpractice, (8) violations of the Washington Law Against Discrimination ("WLAD"), RCW Chapter 49.60, and (9) violations of the Washington Consumer Protection Act ("CPA"), RCW Chapter 19.86. Dkt. 5.

On July 20, 2017, Defendants filed a motion to dismiss arguing that (1) Rawson's § 1983 claims should be dismissed because Defendants are not state actors, (2) Rawson's ADA claim fails as a matter of law, and (3) Defendants are entitled to immunity from Rawson's state law claims. Dkt. 9. On October 25, 2017, the Court denied the motion concluding that (1) Rawson had asserted sufficient allegations to support a "government nexus" between Defendants and state actors and (2) Rawson has asserted sufficient allegations to support a theory that Defendants acted with gross negligence or bad faith, which overcomes the asserted immunity defense. Dkt. 17. The Court did not address Rawson's ADA claim.

On April 13, 2018, Rawson filed a second amended complaint. Dkt. 35. Rawson asserted 66 paragraphs of factual allegations, a claim that Defendants acted under color of law, and ten substantive claims for relief. *Id.* ¶¶ 4.4–4.66, 5.1–5.11. Rawson's substantive claims are as follows: (1) violation of his Fourth Amendment rights, (2) violation of his substantive due process rights under the Fourteenth Amendment, (3) violation of his procedural due process rights under the Fourteenth Amendment, (4) violations of the ADA, 42 U.S.C. § 12132, (5) outrage, (6) false imprisonment, (7) medical malpractice, (8) violations the WLAD, (9) violations of the CPA, and (10) a claim for excessive detention in violation of Washington's Involuntary Treatment Act ("ITA"), RCW 71.05.510. *Id.* ¶¶ 5.2–5.11.

On May 8, 2018, Defendants answered and asserted eleven affirmative defenses. Dkt. 36. Relevant to the instant motions, Defendants asserted that Rawson failed to join one or more indispensable parties and Rawson's damages were caused "by the acts or omissions of third parties over whom Defendants had no control." *Id.* at 8.

On September 5, 2018, Rawson filed a motion for partial summary judgment and Defendants filed a motion for summary judgment. Dkts. 58, 63. On September 24, 2018, the parties responded. Dkts. 73, 76. On September 28, 2018, the parties replied. Dkts. 83, 90. On October 1, 2018, Rawson filed a surreply. Dkt. 93.[1]

---

[1] The Court grants Rawson's motion to strike Defendants' arguments relating to the *Noerr-Pennington* doctrine and the litigation privilege because they were raised for the first time in Defendants' reply. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010) ("arguments raised for the first time in a reply brief are waived."). The Court also grants Rawson's motion to strike Defendants' submission of evidence with their reply. *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). The remainder of Rawson's surreply is improper argument, which the Court will not consider. Local Rules W.D. Wash. LCR 7(g).

## II. FACTUAL BACKGROUND

**A.    RI**

RI is a non-profit corporation incorporated in Arizona that is registered and licensed to do business in Washington.  French, Clingenpeel and Halarnakar were employees of RI during the relevant period.  In 2014, RI contracted with Optum Pierce Regional Support Network ("Optum") to open and operate a facility in Lakewood, Washington that provides evaluation and treatment ("E&T") services.  The Lakewood facility is licensed to confine individuals who are involuntarily committed on an emergency basis under the ITA.

RI's facility was located on the grounds of one of Washington State's main mental hospitals, Western State Hospital.  Dkt. 60-5 at 3.  Halarnakar, RI's medical director, also worked full-time as a doctor at Western State Hospital and part-time as medical director of another E&T service.  Dkt. 77-4 at 5.

**B.    Rawson**

On March 5, 2015, Clark County Sheriff Officer Chris Nicholls detained Rawson and ordered a medical transport to Legacy Salmon Creek Hospital for a mental evaluation.  The incident report provides as follows:

> While working patrol I responded with other deputies to the Bank of America in Hazel Dell. While en route, I was advised that Kenneth Rawson had come back to the bank today after being at the bank the day before. While there the previous day, he had made statements about getting guns and committing mass murder in order for the police to take him seriously. Upon arrival I went in with Deputies O'Dell and Mike Johnson Jr. We made contact with Kenneth and I immediately placed my hands on his forearms and told him not to move. He stated that he had a gun on him and he would comply. I placed him in handcuffs and advised him that he was

being detained and not under arrest. Although he did not physically resist me, he began to yell to everyone in the bank that he had a gun and that his rights were being violated. It was about 11:00 am at the time and there were numerous employees and customers in the building. Deputy Johnson stated that he had taken possession of Ken's loaded handgun and cleared it safely. A loaded Glock magazine was also found in his briefcase.

Ken was taken outside and interviewed by other deputies while I went in and spoke with both Dejanira (DJ) and Jason, who are the Assistant Manager and Manager, respectively. DJ advised that she sat down with Ken yesterday and he began to talk about all the evil people who are against him. He told her that he would sit in front of his TV and "they" would talk to him through his TV. He told her "they" were doing this because of his gun. He asked her if she knew what an AK-47 was but she did not. He explained that an AK-47 was used to shoot all the people in the theater in Colorado. Ken explained to DJ that he was having issues with his banks and his credit and he felt it was a conspiracy against him. He told DJ that all the evil people were making him crazy and that he might have to commit mass murder in order for the police to take him seriously and look at all the evidence he had. He explained again to DJ that all of his phone conversations are being monitored and his Veteran's Affairs (VA) paperwork is being intercepted.

Ken did have a valid concealed weapons permit issued by the Clark County Sheriff's Office. I recommend that this license be reviewed.

When I went outside, I could see and hear that Ken was talking to the other deputies about the same topics of how people are against him and how we all were going to pay. He had several pieces of printed out materials stapled together that he carried in his briefcase that he was concerned about. Per Sgt. Trimble's request, Kenneth was placed on a mental hold and transported to Legacy Salmon Creek Hospital via AMR ambulance. I followed the ambulance there and assisted in checking him in and advising the staff, to include the doctor on duty, of the situation and his statements. I completed a hold form.

Dkt. 57-11 at 4–5.

After Rawson's transport to the hospital, Clark County Designated Mental Health Professional ("DMHP") Al Padilla ("Padilla") evaluated Rawson. On March 6, 2018, Padilla filed a petition in state court for the involuntary commitment of Rawson and a 72-

hour mental health evaluation. Dkt. 61-9.[2] Padilla arranged for Rawson to be evaluated at RI. Dkt. 61-10. When he arrived at RI, French, a Mental Health Professionals, and Clingenpeel, an Advanced Registered Nurse Practitioner, evaluated him. Dkt. 61-11. After the evaluation, Clingenpeel prescribed some medication to address Rawson's "thoughts." *Id.* at 4. Rawson refused the medication. *Id.*

Based on their evaluation of Rawson, Clingenpeel and French completed a petition to involuntarily commit Rawson for fourteen days following the expiration of the initial 72-hour commitment. The petition states that Rawson is "gravely disabled" and "presents a likelihood of serious harm to others" and that he requires "intensive, supervised, 24-hour care." Dkt. 61–13. These conclusions were based on the information in the police report that people were talking to Rawson through the television and the bank employee's comment that Rawson stated he would have to commit mass murder so the police would listen to him. *Id.* Regarding actual treatment at RI, the petition states that Rawson "continues to deny any problem other than the bank and police misunderstanding" and that he "continues to focus on being a victim and is passive in his participation in treatment." *Id.* On March 10, 2015, the court granted the petition and Rawson was involuntarily committed for the additional fourteen days.

On March 14, 2015, Medical Director Halarnakar met Rawson for the first time. Dkt. 61-6 at 8–9. Halarnakar's notes of this interaction state that Rawson was calm, cooperative, and polite but that his speech was pressured. Dkt. 61-12 at 6. Rawson told

---

[2] The parties have redacted a significant amount of information that is publicly available. For example, this allegation appears in Rawson's complaint yet is redacted in his motion.

Halarnakar that he felt like his freedom had been taken away, that he didn't have any symptoms of schizophrenia, and that he didn't hear any voices. *Id.* Halarnakar wrote that Rawson needed to keep taking his medications after discharge and that the issue of Rawson's weapon with the Clark County Sheriff needed to be resolved before Rawson could be discharged. *Id.*

On March 15, 2015, RI fired Clingenpeel because her charting practices were not meeting the appropriate standard. Dkt. 61-15. With Clingenpeel gone, Halarnakar became Rawson's attending provider. Dkt. 61-6 at 13. On March 19, 2015, Halarnakar met with Rawson for a second time. In the notes from this meeting, Halarnakar documented two objective observations: (1) that Rawson became argumentative and denied having a mental illness or needing antipsychotic medications and (2) that he denied suicidal or homicidal ideations. Ex. 12 at 7. Based on these observations, Halarnakar concluded that Rawson had pressured speech, was very paranoid, had no insight, and needed further stabilization. *Id.* Halarnakar prescribed another medication and discussed with French the need to file a petition for an additional 90-day detention. *Id.*

Pursuant to Halarnakar's request, French drafted a petition that day. The petition requested an additional 90 days of involuntary treatment at RI. Dkt. 61-16. The petition alleged that Rawson had "threatened, attempted, or inflicted physical harm upon the person of another or him/herself, or substantial damage to property of another during the period in custody for evaluation and treatment, and presents a likelihood of serious harm." *Id.* Halarnakar and French declared that

[Rawson], continues to display signs of paranoia and delusions with guarded interactions with others. He lacks any connection to the reality of his situation and the reasons that brought him to the evaluation and treatment center.

***

[Rawson] attends groups and interacts occasionally outside of group time. He spends much of his time isolating in his room. At other times has threatened other guests when he does not believe he is being observed. [Rawson] does not acknowledge his mental illness and continues to blame his detainment on his clothing that he wore to the bank.

*Id.* They claimed that Rawson required "intensive, supervised, 24-hour care" and that the court should involuntarily commit him to Western State Hospital. *Id.*

On March 23, 2015, Rawson requested a jury trial on the petition. Dkt. 61-17. On March 24, 2015, the 14-day detention order expired, but RI detained Rawson while he awaited trial on the extended petition. On March 25, 2018, French emailed Pierce County Deputy Prosecuting Attorney Ken Nichols ("Nichols") informing him that the VA had a bed available for Rawson. Dkt. 61-19 at 2. Nichols replied as follows:

By all means end [sic] him to the VA and get him off our radar!
I don't really want to try this case.
I'm not sure there is enough to convince a jury by clear cogent and convincing evidence that he needs to be at Western State.

*Id.* Despite this communication, Rawson remained at RI.

On April 9, 2015, Nichols informed French that Dr. James Manly ("Dr. Manly"), an expert psychiatrist, would come to RI to evaluate Rawson for trial. *Id.* at 46. The next day, Dr. Manly met with Rawson for three and a half hours. Dr. Manly's report provides as follows:

Mr. Rawson presented for his appointment with good hygiene and grooming. His responses to the interview questions were cogent, detailed, lineal, and on topic. He accurately described the events that led to his first

psychiatric admission. He did not become defensive during the interview. He did report a minor level of frustration about why he continued to be hospitalized. Given the facts to this matter, his lack of current psychiatric symptoms, and his lack of mental health history, his expressed frustration did not strike me as unreasonable.

Mr. Rawson did not evidence pressured speech, tangential thinking, or obvious thinking errors. He did not evidence or report symptoms related to psychosis or a mood disorder. He did not report or evidence anger. In fact, throughout the interview Mr. Rawson maintained his composure and did not evidence or report thoughts of suicide or self harm. He did not report or evidence a plan or desire to hurt another person.

As part of the interview, I administered the Personality Assessment Inventory (PAI). The validity indicators noted a mild level of defensiveness. His level of defensiveness is quite typical within forensic settings and not surprising in this situation. He reported some concern about his health, which coincided with his self-report of a spinal injury and bilateral sciatica. The resulting profile PAI was within normal limits. The scales related to mood, psychosis, and impulsivity were not significantly elevated.

I have also spoken to his father who has traveled from Mr. Rawson's home state of Texas. Mr. Rawson reported his son had no mental health history or history of violence to others.

In summary, I do not find Mr. Rawson presently at risk to harm himself or being a danger to others.

*Id.*

On April 16, 2015, Nichols emailed Dr. Manly's report to Halarnaker and French. Dkt. 61-19 at 32. Nichols followed up with an email providing the statutory grounds for involuntary commitment and requesting that Halarnaker and French provide specific statements that Rawson made at RI that were threatening. *Id.* at 10. Halarnaker replied that Rawson "has refused to talk lately." *Id.* at 9. Nichols's response requested clarification that Halarnaker was forcefully medicating Rawson every night and, if so, that could explain why Rawson presented so well to Dr. Manly. *Id.* Halarnaker confirmed the nightly injections and stated that they did not have any "threatening

statements." *Id.* Halarnaker also wrote that Rawson told them that "he won't hurt anyone." *Id.* Nichols wrote that he knew Rawson's "symptoms have subsided because he's been on meds, but without them maybe he would be gravely disabled quickly." *Id.* at 11. Halarnaker replied "[t]hat is the only argument we have." *Id.*

On April 27, 2015, Halarnakar wrote to Nichols informing him of a mutual resolution to the situation. Halarnakar stated that Rawson had agreed to sign a voluntary commitment form, and, in return, RI was going to transport Rawson to the Portland VA so that he could be evaluated and, if necessary, treated at that inpatient facility. Dkt. 61-12 at 9–10. Halarnaker stated that if Nichols agreed with the plan, then RI would transport Rawson the following day. *Id.* at 10. On April 29, 2015, RI discharged Rawson.

On August 16, 2016, the Washington Court of Appeals held that Rawson's "detention was improper because [Padilla] did not consult with an examining physician as required by RCW 71.05.154." *In re Det. of K.R.*, 195 Wn. App. 843, 846 (2016).

In support of his claims, Rawson has submitted the expert report of Dr. Jeffrey Geller ("Dr. Geller"). Dkt. 78. In short, Dr. Geller opines that RI's records do not support the decisions to involuntarily commit Rawson, RI's records do not support the medical decision to forcibly medicate Rawson, less restrictive alternatives existed, and RI's staff was not qualified to evaluate and treat Rawson. *Id.* at 81–82.

On the other hand, Defendants have submitted the expert report of Dr. Mark R. McClung ("Dr. McClung"). Dkt. 48-1. Dr. McClung opines that "[t]he length of time Mr. Rawson remained at Recovery Innovations was not related to any deficits in his

psychiatric treatment." *Id.* at 4.  He also opines that Rawson's entire period of involuntary commitment was medically justified.  *Id.*  For example, he declares that

> The Petition for 90-day commitment (completed by clinicians at Recovery Innovations) provides information to meet one of the two possible requirements for a 90-day commitment (threatened violence), as well as providing a relevant diagnosis and an opinion that [a least restrictive alternative] is not recommended.

*Id.*

## III.  DISCUSSION

**A.    Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.    42 U.S.C. § 1983**

To prevail under § 1983, a plaintiff must show (1) that defendants deprived him of a right secured by the Constitution or laws of the United States and (2) that, in doing so, Defendants acted under color of state law. *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156–57 (1978).

In this case, the parties dispute whether Defendants acted under color of law. As a general rule, it is presumed that actions by private parties are not taken under color of state law. *Florer v. Congregation Pidyon Shevuyim, N.A.,* 639 F.3d 916, 922 (9th Cir. 2011) ("We start with the presumption that conduct by private actors is not state

action.").  However, "[i]f the [Constitution] is not to be displaced, . . . its ambit cannot be a simple line between States and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed."  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).

In the Court's order denying Defendants' motion to dismiss on this issue, the Court discussed the various tests courts implement when considering state action and concluded that Rawson has asserted sufficient factual allegations to state a plausible claim.  Dkt. 17 at 2–7.  That order, however, dealt with this issue at a high level of generality, which has caused significant problems with the current round of motions and pretrial filings.  In retrospect, the Court should probably have granted Defendants' motion, dismissed Rawson's claims without prejudice, and granted Rawson leave to amend because the state action "inquiry 'begins by identifying the specific conduct of which the plaintiff complains.'"  *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814 (9th Cir. 2010) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks omitted)); *see also Blum v. Yaretsky*, 457 U.S. 991, 1003 (1982) ("Faithful adherence to the 'state action' requirement . . . requires careful attention to the gravamen of the plaintiff's complaint.").

Turning to Rawson's complaint, each claim is a single sentence based on the factual allegations asserted above.  *See, e.g.*, Dkt. 35, ¶ 5.2 ("The facts described above constitute violations of Mr. Rawson's Fourth Amendment rights by Recovery Innovations, Ms. French, Ms. Clingenpeel, and Dr. Halarnakar.").  Such general claims

has resulted in confusion as to the gravamen of Rawson's complaint as to each claim against each defendant. *See, e.g.*, Dkt. 90 at 3 ("Plaintiff finally identified his 'gross negligence' claims [in his response brief.]"). Likewise, the disputed jury instructions are the functional equivalent of mini-motions for summary judgment. *See, e.g.*, Dkt. 126 at 12 ("Plaintiff's Fourth Amendment claim cannot be reconciled with the Washington Supreme Court's opinion in *In re McLaughlin*, 100 Wn.2d 832 (1984), which considered the technical sufficiency of two petitions for 90-day involuntary commitments. Rather than creating a duty to withdraw a defective petition, the Supreme Court recognized that petitions could be re-drafted, modified and amended before, during or even after trial. However, if the Court disagrees, Defendants propose the instruction below.").

In light of the existing record, the Court finds that numerous legal issues exist within Rawson's § 1983 claims. The Court will highlight some of these issues below in addressing Rawson's two theories of state action: (1) government nexus and (2) public function. Dkt. 35, ¶ 5.1. The Court will address the latter theory first.

### 1.     Public Function

"The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.'" *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003) (quoting *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002)).

In this case, Rawson argues that "RI and it employees perform a function historically performed exclusively by state actors." Dkt. 58 at 14. Rawson relies on *In re Det. of S.E.*, 199 Wn. App. 609 (2017), *review denied*, 189 Wn.2d 1032 (2018), to support his position, but that court only considered whether an individual has a right to a

jury trial at the 14-day petition hearing, *id.* at 617–18.  The court concluded that "the probable cause hearing set forth by RCW 71.05.240 features an adversarial proceeding wherein a judge—rather than a jury—decides whether, by a preponderance of the evidence, a person's mental illness justifies a cumulative detention period of up to 17 days." *Id.* at 619.  The court also concluded that "[t]here is no indication in our territorial or early statehood authority that a jury was required to decide whether a person's suspected insanity justified detaining the person for up to 17 days." *Id.*  Rawson fails to show how this authority stands for the proposition that involuntary commitments are both traditionally and exclusively governmental.  Therefore, the Court grants Defendants' motion and denies Rawson's motion on the issue of state action under the public function test.

### 2.     Government Nexus

"In order to be considered state action, when a private actor participates in a governmental act, the court must find a sufficiently close nexus between the state and the private actor 'so that the action of the latter may be fairly treated as that of the State itself.'" *Jensen v. Lane Cty.*, 222 F.3d 570, 575 (9th Cir. 2000) (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 (1974)).

In this case, Rawson has failed to fully articulate his claims and the parties approach this test from a high level of generality.  Based on Rawson's proposed jury instructions and proposed verdict form, it appears that Rawson asserts § 1983 claims as follows: (1) all four Defendants improperly seized Rawson in violation of the Fourth Amendment, (2) all four Defendants wrongfully detained Rawson through the use of

deliberately fabricated evidence in violation of the Fourteenth Amendment, (3) all four

Defendants violated Rawson's bodily integrity in violation of the Fourteenth

Amendment, and (4) Halarnakar violated Rawson's Fourth and Fourteenth Amendment

rights by failing to supervise the act or omissions of RI's employees.  Dkts. 126 at 12–26,

126-1 at 1–4.  Defendants have not challenged the propriety of these claims or whether

Rawson has evidence to support each element of each claim.  This is fatal to the Court's

ability to properly consider whether Defendants acted under color of law because

"[f]aithful adherence to the 'state action' requirement . . . requires careful attention to the

gravamen of the plaintiff's complaint." *Blum*, 457 U.S. at 1003. Regardless, the Court

will address as much of the dispute as possible based on the briefs and the current record.

The parties seem to implicitly agree that the facts of this case fall somewhere

between the facts of *Jensen*, 222 F.3d 570, and the facts of *Hood v. King Cty.*, C15-

828RSL, 2017 WL 979024, at *13 (W.D. Wash. Mar. 14, 2017), *aff'd sub nom. Hood v.

Cty. of King*, 17-35320, 2018 WL 3462496 (9th Cir. July 18, 2018).  In *Jensen*, the

plaintiff was arrested after pointing his gun out a car window at a pedestrian.  222 F.3d at

572.  Based on this incident and other information regarding plaintiff's threatening

behavior, a public mental health specialist consulted with another public mental health

specialist and Jeffrey M. Robbins, M.D. ("Dr. Robbins"), a private specialist under

contract with the county.  *Id.* at 572–73.  After these consultations, the public mental

health specialist recommended that plaintiff be detained at a public mental health hospital

for evaluation.  *Id.* at 573.  Dr. Robbins signed an order detaining plaintiff without

personally evaluating the plaintiff and based his decision entirely on the police reports

and information gained from the public doctors.  *Id.*  Dr. Robbins briefly met with

plaintiff over the course of the next three days of plaintiff's detention, but the plaintiff

"did not cooperate in the examination, so Dr. Robbins again relied heavily on police

reports and information obtained from [the public doctors] in deciding to continue

[plaintiff's] detention."  *Id.*  On the fourth day of detention, a public doctor evaluated

plaintiff and concluded that there was insufficient evidence to proceed with requesting a

court order for additional detention.  *Id.*  Dr. Robbins agreed with this conclusion, and the

plaintiff was released.  *Id.*

Dr. Robbins moved for summary judgment on the plaintiff's § 1983 claim arguing

that he did not act under color of law.  *Id.*  The district court granted the motion but the

Ninth Circuit reversed.  *Id.* at 573, 575–76.  The Ninth Circuit found and concluded as

follows:

> The record is clear that Dr. Robbins and the County through its
> employees have undertaken a complex and deeply intertwined process of
> evaluating and detaining individuals who are believed to be mentally ill and
> a danger to themselves or others. County employees initiate the evaluation
> process, there is significant consultation with and among the various mental
> health professionals (including both [private] psychiatrists and county crisis
> workers), and [the private employer] helps to develop and maintain the
> mental health policies of [the public mental health hospital]. We are
> convinced that the state has so deeply insinuated itself into this process that
> there is "a sufficiently close nexus between the State and the challenged
> action of the [defendant] so that the action of the latter may be fairly treated
> as that of the State itself." *Jackson*, 419 U.S. at 350.

*Jensen*, 222 F.3d at 575.

On the other hand, in *Hood*, this Court concluded that the private actors did not act

under color of law.  Plaintiff Luci Hood was detained by deputies after they observed her

approach other individuals in a threatening way.  *Hood*, 2017 WL 979024 at *3.  The

deputies called an ambulance, which transported Ms. Hood to a private hospital for an

evaluation under the ITA.  *Id.*  Although the facts regarding the origination of Ms.

Hood's detention do not appear in the published order, in the public, redacted version of

the motion for summary judgment, the defendants assert that a team of two public

DMHPs personally evaluated Ms. Hood at the private hospital and then filed a petition

for a 72-hour involuntary hold.  *Hood*, C15-828RSL, Dkt. 68 at 6–7.  Once that hold was

in place, Ms. Hood was transferred to another private hospital for treatment and

evaluation.  Ms. Hood alleged that the new hospital failed to provide an independent

assessment of her mental health and continued the involuntary hold based purely on the

DMHP's petition.  *Id.*, Dkt. 1-1 at 10–11.  Based on these facts, the Court found and

concluded as follows:

> A sufficiently close nexus does not exist in this case. In *Jensen v. Lane County*, 222 F.3d 570 (9th Cir. 2000), the Ninth Circuit held that where a private medical provider and a county through its employees "have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others," the government has "so deeply insinuated itself into this process that there is 'a sufficiently close nexus between the State and the challenged action of the defendant so that the action of the latter may fairly be treated as that of the State itself.'" *Jensen*, 222 F.3d at 575 (quoting *Jackson*, 419 U.S. at 350). Ms. Hood argues that *Jensen* controls here, but the Court disagrees.
>
> In *Blum v. Yaretsky*, 457 U.S. 991 (1982), the U.S. Supreme Court found no state action where the challenged medical determinations were "made by private parties according to professional standards that are not established by the State." *Blum*, 457 U.S. at 1008. In *Jensen*, the Ninth Circuit distinguished *Blum* on the grounds that in *Jensen*, though the committing physician made the medical judgment under which the plaintiff was detained, "[c]ounty employees initiate[d] the evaluation process, [and] there [was] significant consultation with and among the various mental

health professionals (including both [private] psychiatrists and county crisis workers)," such that the state's involvement in the decision-making process overrode the private provider's "purely medical judgment." *Jensen*, 222 F.3d at 575.

Such is not the case here. It is true that county law enforcement initiated Ms. Hood's ITA process; that county DMHPs relied significantly on the reports of hospital staff in conducting the assessment that led to Ms. Hood's 72-hour detention; that the hospital boarded Ms. Hood after the county DMHPs initiated the 72-hour detention; and that a hospital psychiatrist declined to release Ms. Hood apparently out of deference to the county DMHPs' detention recommendation. But unlike in *Jensen*, where the private practitioner was operating under contract with the county, 222 F.3d at 573, the private hospitals in this case were fulfilling their own statutory responsibilities under the ITA rather than a contractual responsibility to King County. Moreover, the plaintiff in *Jensen* was detained in a county psychiatric hospital, then discharged to the county jail, *id.*, while in this case Ms. Hood was detained exclusively at private hospitals and then released.

The facts here reveal sustained and routine cooperation between King County and the hospitals, but they do not show that the county's involvement overrode the hospital staff's medical judgment such that the hospitals' actions can fairly be treated as those of the government. Accordingly, the hospitals were not acting under color of law, and Ms. Hood's constitutional claims against the hospitals for deprivation of liberty and privacy must be dismissed.

*Hood*, 2017 WL 979024 at *12–13.

While these authorities provide principles to evaluate Rawson's claims, the parties deal only in generalities that all four Defendants were or were not acting under color of law at all times. This approach seems unworkable because Rawson's initial involuntary commitment is similar to Ms. Hood's and later commitment is similar to the facts considered in *Jensen*. For example, Padilla, the county DMHP, ordered Rawson's initial 72-hour detention. After that, Clingenpeel and French evaluated Rawson and submitted the 14-day petition. Although Rawson alleges that they based the petition mostly on information contained in the police reports, Rawson fails to cite facts establishing that

their independent medical judgment was improperly influenced by state actors. This is unlike *Jensen* where the private doctor failed to personally interview the detainee and based his detention decision purely on the police reports and information provided by public doctors. Thus, it is hard to reach the conclusion that "the state has so deeply insinuated itself into this process" that Clingenpeel and French's actions should be considered those of the state itself. *Jensen*, 222 F.3d at 575. Instead, it is a much more reasonable conclusion that Rawson has failed to establish "that the county's involvement overrode the hospital staff's medical judgment such that the hospitals' actions can fairly be treated as those of the government." *Hood*, 2017 WL 979024 at *13. This would be a simpler matter if Rawson's ordeal ended at this point.

This is the point when the circumstances move toward those encountered in *Jensen*. The state court granted the petition for an additional fourteen days of detention, and RI fired Clingenpeel. Halarnakar became Rawson's treating physician, and he worked with Nichols to pursue a 90-day involuntary commitment order. While Defendants assert that this was "routine cooperation," the emails evidence persuasion and a joint effort to continue Rawson's detention. Nichols even proposed a new theory for the detention, which could establish state action that overrode Halarnakar and/or French's independent medical judgment. Thus, it would be easy to conclude that Halarnakar and/or French engaged in a complex and intertwined process with Nichols, similar to the individuals in *Jensen*.

The main problem, however, is that the Court can only address these issues as hypotheticals because Rawson has failed to explain the gravamen of his complaint with

these detentions and what defendant violated his rights at what point during these detentions. He also seems to claim that his rights were violated because one or more defendants failed to release him but doesn't explain at what point he should have been released. So many possibilities exist that it is impossible for the Court to evaluate when "the county's involvement overrode the hospital staff's medical judgment such that the hospitals' actions can fairly be treated as those of the government." *Hood*, 2017 WL 979024 at *12–13. Moreover, Rawson fails to show how RI, as the employer, would be responsible under respondeat superior for the individual actions of its staff. *See, e.g.*, *Austen v. Cty. of Los Angeles*, 15-07372 DDP (FFMX), 2018 WL 501552, at *9 (C.D. Cal. Jan. 19, 2018) (considering § 1983 liability of hospital based only on its policies, practices, or customs). Issues also exist regarding how the Court should address underlying factual disputes that are pertinent to the state action inquiry. Therefore, the Court denies without prejudice the parties' motions on the issue of state action because the facts, claims, and issues are not amenable to consideration at this point.

**C.     ADA**

Rawson asserts a claim for a violation of § 12132 of the ADA. Dkt. 35, ¶ 5.5. Title II of the ADA prohibits a public entity from discriminating against a qualified individual with a disability on the basis of that disability. 42 U.S.C. § 12132. To state a claim of disability discrimination under Title II, the plaintiff must allege four elements: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits

of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).

In this case, Defendants move for summary judgment on Rawson's ADA claim. Rawson fails to identify a single fact to support any of the elements of his claim. Instead, he argues that the Court rejected Defendants' arguments in denying their motion to dismiss the complaint. Dkt. 76 at 23. The Court, however, denied Defendants' motion without specifically addressing the merits of this claim. *See* Dkt. 17. Thus, Rawson is relying on an implicit rejection of these arguments, which is not a very persuasive position.

Rawson also asserts that Defendants "provide no new facts so the Court's prior ruling applies to this Motion." Dkt. 76 at 23. Rawson is incorrect because it is not Defendants' burden to provide facts. It is Defendants' duty, as the moving party, to "demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once that is established, Rawson must submit actual evidence on the contested elements of his claim. *Id.* ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims"). Rawson has failed to meet his burden and merely rests on the Court's previous order. "It is not our task, or that of the district court, to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In the

absence of identified evidence establishing every element of his claim, the Court grants Defendants' motion for summary judgment on Rawson's ADA claim.[3]

**D.  ITA**

Defendants move for summary judgment on the issue of immunity under the ITA, Dkt. 63 at 18–21.  Rawson moves for summary judgment on at least a portion of his claim that Defendants violated the ITA.  Dkt. 58 at 18–19.  The Court will address the immunity issue first and then the merits of Rawson's claim.

**1.  Immunity**

Under the ITA, Defendants are immune from liability for performing their duties as long as the "duties were performed in good faith and without gross negligence."  RCW 71.05.120(1).  "Gross negligence is that which is substantially and appreciably greater than ordinary negligence."  *Estate of Davis v. State, Dep't of Corr.*, 127 Wn. App. 833, 840 (2005), *as amended* (June 2, 2005), *publication ordered* (June 2, 2005).

In this case, Defendants request immunity because Rawson's only evidence supporting gross negligence should be disregarded.  Dkt. 63 at 19.  For example, Defendants have essentially filed a motion to exclude Dr. Geller asserting that the Court is "obligated to disregard his facially erroneous and baseless opinions."  Dkt. 63 at 19.  The Court declines Defendants' invitation to convert a portion of their summary judgment motion into a motion to exclude.  Similarly, Defendants argue that Rawson's

---

[3] If Rawson intends to assert a claim under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999), 28 C.F.R. § 35.130(d), or 28 CFR § 41.51(d), as set forth in his trial brief, he must file a motion to amend his complaint because he specifically limited his claim to a violation of 42 U.S.C. § 12132.  Dkt. 35, ¶ 5.5.

"absurd testimony . . . is not credible and need not be considered for purposes of

summary judgment." Dkt. 90 at 3 n.6. While the Court may disregard evidence in

certain circumstances, *see Scott v. Harris*, 550 U.S. 372, 380 (2007), Defendants have

failed to show that Rawson's testimony is "blatantly contradicted by the record," *id.* If a

juror believes Rawson such that Clingenpeel filed the 14-day petition for Rawson's

continued involuntary detention after an evaluation that lasted less than 15 seconds, then

the jury could find that Clingenpeel was grossly negligent in performing her duties.

Regardless, Defendants' motion is based entirely on the Court disregarding Rawson's

evidence, which the Court refuses to do. Therefore, the Court denies Defendants' motion

on this issue.

### 2. ITA Liability

Rawson moves for partial summary judgment on his claim for excessive detention

in violation of the ITA. Dkt. 58 at 18–19. Regarding the burden of proof on this issue,

"*where the moving party has the burden*—the plaintiff on a claim for relief or the

defendant on an affirmative defense—*his showing must be sufficient for the court to hold*

*that no reasonable trier of fact could find other than for the moving party*." *Calderone v.*

*United States*, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted; emphasis in original);

*see also Southern Calif. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

The civil commitment statute requires that "providers act in good faith" and can

"be held civilly liable for . . . detaining a person for more than the allowable number of

days." *In re Det. of June Johnson*, 179 Wn. App. 579, 589 (2014) (citing RCW

71.05.510). The 14-day involuntary commitment shall terminate during the commitment

when "in the opinion of the professional person in charge of the facility or his or her professional designee, (a) the person no longer constitutes a likelihood of serious harm, or (b) no longer is gravely disabled, or (c) is prepared to accept voluntary treatment upon referral, or (d) is to remain in the facility providing intensive treatment on a voluntary basis." RCW 71.05.260.

In this case, Defendants have submitted evidence that at most establishes the existence of material question of facts on this issue and at least establishes that a reasonable trier of fact could find other than for Rawson. Dr. McClung opines that Rawson's detention was medically justified, which, taken in the light most favorable to Defendants, establishes a question of fact whether Rawson no longer constituted a likelihood of serious harm. Therefore, the Court denies Rawson's motion on this issue.

**E.    RCW Chapter 7.70**

Defendants argue that, "[u]nder Washington law, claims arising out of healthcare, regardless of the type of claim, are governed by Chapter 7.70 RCW." Dkt. 63 at 22. Defendants rely on *Ewing v. Good Samaritan Hosp.*, C07-5709 FDB, 2009 WL 2855623 (W.D. Wash. Aug. 31, 2009), to support their position. Dkt. 63 at 22. In *Ewing*, the Court considered an unopposed motion for summary judgment based on the hospital and child protective services removing a drug addicted newborn from its parents. *Ewing*, 2009 WL 2855623 at *3. Defendants rely on the *Ewing* Court's conclusion that the plaintiff's claims were strictly limited to medical malpractice because the plaintiff failed to produce any evidence of assault, battery, or false imprisonment. Dkt. 63 at 22. Defendants' reliance, however, is misplaced because unlike the plaintiff in *Ewing*,

Rawson has submitted sufficient evidence to support his other state law claims. Therefore, the Court denies Defendants' motion on this issue.

**F.    CPA**

The CPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  RCW 19.86.020.  To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation.  *Hangman Ridge Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784 (1986).

In this case, Defendants move for summary judgment on Rawson's CPA claim. Rawson contends that Defendants "held themselves out to the public as qualified and capable of evaluating and treating patients . . .  but they were not."  Dkt. 76 at 25. Rawson fails to identify how each defendant individually accomplished this deception, which is sufficient reason alone to grant Defendants' motion.  Moreover, Rawson fails to cite any fact that establishes deception in obtaining or retaining patients at RI.  This is fatal to any claim based on the entrepreneurial activities of these medical professionals. *See Michael v. Mosquera-Lacy*, 165 Wn.2d 595, 603 (2009) ("Entrepreneurial aspects do not include a doctor's skills in examining, diagnosing, treating, or caring for a patient.") (citing *Wright v. Jeckle*, 104 Wn. App. 478, 485 (2001)).

Defendants also argue that Rawson has failed to establish any damage to his business or property.  Dkt. 63 at 24.  Rawson contends that his payment to Dr. Geller to investigate his claims constitutes a prelitigation injury.  Dkt. 76 at 25.  None of the cases

Rawson cites stands for the proposition that hiring a medical expert to provide an opinion that can be used to establish medical malpractice or similar claims is an injury sufficient to establish a CPA claim. If this were the law, then every plaintiff that hired an expert prior to filing a complaint could include a CPA claim seeking treble damages and attorney's fees. This is an absurd proposition. Therefore, the Court grants Defendants' motion on Rawson's CPA claim.

## G.    False Imprisonment

Rawson moves for partial summary judgment on his claim for false imprisonment for his detention after April 16, 2015. Dkt. 58 at 19. "Unlawful imprisonment is the intentional confinement of another's person, unjustified under the circumstances." *Kellogg v. State*, 94 Wn.2d 851, 856 (1980).

Similar to Rawson's claim for excessive detention under the ITA, Rawson fails to establish that no reasonable juror could find other than for him. Dr. McClung's opinion at least creates a question of fact whether Rawson's confinement was unjustified under the circumstances. Therefore, the Court denies Rawson's motion on this issue.

## H.    Affirmative Defenses

Rawson moves for summary judgment on Defendants' affirmative defenses that Rawson failed to join indispensable parties and that his damages were caused by third parties. Dkt. 58 at 21–25. Regarding the former, Defendants failed to directly respond or provide any authority in support of their position. At most, Defendants argue that dismissal of this defense "is not appropriate at this stage." Dkt. 73 at 23. Contrary to Defendants' position, dismissal is appropriate at this stage if they, as the non-moving

party, fail to establish that material questions of fact exist for trial. *See* Fed. R. Civ. P. 56. Turning to the merits, a party is "required" only if (1) complete relief cannot be accorded among the existing parties, or (2) the party has a legal interest in the subject of the suit or could, through its absence, subject an existing party to multiple or inconsistent legal obligations. Fed. R. Civ. P. 19(a).

During discovery, Defendants identified Clark County Sheriff's Office, Clark County Crisis Services, and Legacy Salmon Creek Medical Center as indispensable parties. Regarding the first two entities, it is unlikely that they could even be parties because they are entities operated by Clark County, which would be the real party in interest. *Bradford v. City of Seattle*, 557 F. Supp. 2d 1189, 1207 (W.D. Wash. 2008) ("In order to bring an appropriate action challenging the actions, policies or customs of a local governmental unit, a plaintiff must name the county or city itself as a party to the action, and not the particular municipal department or facility where the alleged violation occurred.") (citing *Nolan v. Snohomish County*, 59 Wn. App. 876, 883 (1990)). Despite this probable error, Defendants have failed to submit any fact establishing that either the sheriff's office or the crisis service is "indispensable." Therefore, the Court grants Rawson's motion as to these parties.

Likewise, Defendants fail to submit any fact establishing that Legacy Salmon Creek Medical Center is indispensable. Therefore, the Court grants Rawson's motion on Defendants' affirmative defense of failure to add an indispensable party.

Regarding the defense that Rawson's damages were cause by third parties, such a defense is an attack on the sufficiency of Rawson's claims and "is not a proper

affirmative defense." *Moore v. King Cty. Fire Prot. Dist. No. 26*, C05-442JLR, 2006 WL 2061196, at *14 (W.D. Wash. July 21, 2006), *aff'd in part*, 327 Fed. Appx. 5 (9th Cir. 2009). For example, the question of fact whether Rawson suffered damages caused by Defendants' actions is for the jury to decide based on the evidence presented. Defendants may present evidence of intervening or superseding causes of Rawson's alleged damages, but such evidence would not establish a proper affirmative defense. *Id.*; *see also Hernandez v. Cty. of Monterey*, 306 F.R.D. 279, 283 (N.D. Cal. 2015) ("An affirmative defense, under the meaning of Federal Rule of Civil Procedure 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."). Therefore, the Court grants Rawson's motion on this affirmative defense.

## I.  Trial

The Court finds that this matter is not currently ready for trial. Because of the uncertainty of Rawson's § 1983 claims and upon review of the pretrial filings, this matter is unmanageable in its current state and the Court has serious doubts as to the reliability of any jury verdict. Therefore, the Court *sua sponte* strikes the current trial date and pretrial conference. The Court does not reach this conclusion lightly, and the undersigned has never continued a trial due to manageability concerns. The Court has considered reasonable alternatives to moving trial at this late date but is unable to find an alternative that alleviates the concerns stated herein. This matter presents unique problems, identified above, that necessitates further narrowing of the issues before convening a jury to decide the issues. The parties shall file a joint status report setting a

proposed briefing schedule on the remaining issues, specifically Rawson's § 1983 claims,

and a proposed trial date.  The report shall be filed no later than December 14, 2018.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for summary

judgment, Dkt. 63, and Rawson's motion for partial summary judgment, Dkt. 58, are

**GRANTED in part** and **DENIED in part** as stated herein.  The pretrial conference and

trial are **STRICKEN**.  The parties shall file a joint status report no later than December

14, 2018.

Dated this 27th day of November, 2018.

BENJAMIN H. SETTLE
United States District Judge